BILLY J. WILLIAMS, OSB #901366
Acting United States Attorney
District of Oregon
FRANK R. PAPAGNI, JR., OSB #762788
Assistant United States Attorney
frank.papagni@usdoj.gov
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401
Telephone:   (541) 465-6771
Facsimile:    (541) 465-6917
Attorneys for the United States

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case Nos. 3:97-CR-14-MA |
| | 6:11-CR-60062-AA |
| | 6:13-CR-135-AA |
| v. | 6:13-CR-545-AA |
| THOMAS WILLIAM CORNELIUS, JR., | **UNITED STATES'** |
| | **SENTENCING MEMORANDUM** |
| Defendant. | Sentencing:   7/9/15 @ 11:00 a.m. |

The United States of America, by and through Billy J. Williams, Acting United States Attorney for the District of Oregon, and Frank R. Papagni, Jr., Assistant United States Attorney, respectfully submits the following sentencing memorandum to aid the court in determining a just and appropriate sentence.

Defendant is to be sentenced for possessing numerous stolen firearms after having served a sentence for being an Armed Career Criminal.   He burglarized homes, aided by an accomplice, while he possessed a loaded gun(s) that had been

UNITED STATES' SENTENCING MEMORANDUM                    Page 1

stolen in prior burglaries.   While in prison awaiting trial on those charges, he bludgeoned and stabbed one inmate, and cut the throat of another with a razor blade while the inmate was still handcuffed.   He is to be sentenced for those crimes and for possessing the weapons he used when committing them.   Finally, because Defendant was on supervised release when committing the aforementioned crimes, he is also facing revocation in USDC Case No. 3:97-CR-14-MA.

The government respectfully concurs with Senior United States Probation Officer Patti Robb's factual findings, advisory guideline calculations and her sentencing recommendations contained in the Presentence Investigation Report. Officer Robb recommends, as does the government, that Defendant be sentenced to life imprisonment with no term of supervised release.   The justification section of her sentencing recommendation combined with the facts and information contained in this memorandum warrant imposition of such a sentence.

## Summary

Defendant violated his supervise release in Case No. 3:97-CR-14-MA, by repeatedly committing the same crime, *i.e.* being an armed career criminal (Case No. 6:11-CR-60062-AA), and for assaulting and attempting to murder his fellow inmates for purportedly being informants (Case Nos. 6:13-CR-135-AA and 6:13-CR-00545-AA).   His recent violent crimes combined with an extensive criminal history of violence and coupled with extreme anti-social attitudes and values

UNITED STATES' SENTENCING MEMORANDUM                    Page 2

warrants "the second most severe penalty permitted by law," life without parole. *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991)(opinion of Kennedy, J.).

<u>18 U.S.C. § 3553 Factors</u>

**1.    Nature and Circumstances of the Offenses**

The Presentence Report's Offense Conduct section details Defendant's crimes. PSR ¶¶ 21-49.   Having presided over his three jury trials and numerous pretrial motions, the Court is familiar with the nature and circumstances of each offense, so the following simply summarizes his offenses:

**A.    <u>Case No. 6:11-CR-60062-AA</u> - Armed Career Criminal (7 Counts)**

On May 3, 2011, Defendant was caught speeding by an Oregon State trooper. Found in the trunk of his rental car were two loaded pistols that had been stolen during burglaries of homes on February 23 and March 22, 2011.   Having been previously convicted in 1997 of being a career criminal while armed with a pistol that he used to rob and shoot his victim, the trooper arrested the Defendant for being a felon in possession of firearms.   His federal and state probation officers placed detainers on him by.[1]

Defendant knew a life sentence would be the consequence of his possessing the firearms, but was not deterred.   During recorded jail conversations, he repeatedly

---

[1] Defendant received a 120-day jail sanction for violating his post-prison supervision for Robbery in the First Degree with a Firearm and Assault in the Second Degree with a Firearm.   Washington County Circuit Court Case No. C962253CR.   2015 PSR ¶ 108.   Former Circuit Court Judge and now U.S. District Court Judge Marco Hernandez sentenced Defendant to 160 months in prison to be served concurrently with his federal sentence.

UNITED STATES' SENTENCING MEMORANDUM                              Page 3

told his friend "Sparky" Sanborn, that he expected a "life sentence."[2]   He confided in Sanborn, an alcoholic who had supplied Defendant with cash, a place to reside, and also allowed him to use his credit card and pickup truck.   Defendant also sold Sanborn a revolver that Defendant, along with Christopher "Penguin" Cambalik, had stolen from the Madison home in February 2012.

Defendant's jail calls led Bureau of Alcohol, Tobacco and Firearms Agent Woods and Oregon State Police Detective Riddle to Sanborn and Cambalik, whose cooperation connected Defendant to twenty-nine burglaries and to Defendant's other accomplices, Jeremy Mauer and Christopher Myers.

Cambalik assisted the state police detective and federal agent with the recovery of five handguns stolen during burglaries of the Kuehn, Sprague and Conrad homes, and directed them to five firearms stolen during the burglaries of the Hultin, Carroll and Madison homes.

Defendant told Charlene Orchard on May 14, 2011, that he thought Cambalik was "talking to the feds" and that Cambalik "better pray he doesn't go to jail."   Ms. Orchard described Defendant's statement when she testified before the grand jury on September 22, 2011, as "absolutely" a threat.

---

[2] Douglas County Jail Recording, May 6, 2011 at 10:49 am - "They're gonna give me life in prison"); and, at 11:40 am - "they're gonna give me a life sentence." Multnomah County Detention Center Recording, May 19, 2011 at 7:59 pm - "But I'm the only one that's gonna do the rest of his life in prison. * * * I mean, literally. They're gonna give me life in prison. * * * I gotta take this to trial and try to beat it." * * * . . . you know the people I love and care about just fuckin' gave me a life sentence, basically. * * * I'll get a life sentence in the feds. * * * They gave me fifteen fuckin' years last time. * * * They're gonna fuckin' double it.   They're gonna give me thirty to life."

In his first burglary, *i.e.* the Kuehn home, Defendant and his accomplice, Maurer, stole a loaded pistol and a shotgun.   Thereafter, according to all of his accomplices, Defendant possessed or carried a pistol when breaking into other victims' homes.   The jury found that Defendant stole twelve firearms when burglarizing the Hultin, Carroll, Conrad, Madison, Sprague and Nall homes.   He was acquitted of possessing the revolver stolen from the Catalfamo home.

According to Cambalik, on March 2, 2011, Defendant was seen burglarizing a home in Drain, Oregon, and wanted to shoot and kill the female witness.   At the time of the burglary, the witness's description matched that of the Defendant and she described a pickup truck which Cambalik confessed to driving.

In the home burglaries committed by Defendant which are known to the government, all but one (the Catalfamo home) he had an accomplice and forced or broke open a door.   He carried a loaded handgun and, according to accomplices, during two of the burglaries, he had a pistol in hand when he entered the Hultin home and left the McCall home.

Defendant and his accomplice(s) would ransack the homes.   Defendant often entered the victims' bedrooms and typically used a pillowcase to carry off the stolen property.   He focused on stealing firearms and jewelry.   He used three different vehicles to commit the burglaries.   He would then quickly sell the stolen jewelry to a local jeweler, *i.e.* John Kauffman.

In 1984, Multnomah County deputies responded to a home burglary in progress and found signs of a forced entry, a ransacked home, the victim's property in a pillowcase and a stolen car in the victim's driveway.   1997 PSR ¶56.   The 19-year old Defendant had fled the scene.   However, his accomplice who had carried a handgun while committing the burglary, pulled it out as deputies approached and was shot and killed.   *Id.*

In 1985, a 20-year old Defendant told Clinical Psychologist Robert Stuckey that as a teenager that he resided with a person whose profession was fencing stolen material and selling drugs.   When he sold illegal drugs, Defendant carried a gun.

In 1988, a woman returned home to find the 23-year old Defendant and his accomplice driving away in a stolen car.   1997 PSR ¶ 63.   Her front door had been forced open, her home ransacked and her gold braided necklace stolen.   *Id.* Defendant was identified as one of the burglars because he had knocked on the victim's neighbor's door and asked for "Mr. Becker."   *Id.*   The neighbor had written down the stolen car's license plate.   *Id.*   When arrested, Defendant was wearing the victim's necklace.   *Id.*

While on federal supervised release and state post-prison supervision, Defendant would usually carry one or two stolen handguns and have Cambalik, Sanborn, or Steve Sonneson, non-felons, store the other stolen firearms.   He shot the handguns with Cambalik, Sanborn and Sonneson, and showed them to Myers and Joshua Street.   He photographed three stolen pistols on his cellular telephone

UNITED STATES' SENTENCING MEMORANDUM                    Page 6

(Sprague, Carroll and Nall), and later deleted them.   Defendant kept the stolen handguns and gave the stolen long guns to his accomplice.

In March 2015, Defendant was found guilty by a jury of being a felon in possession of twelve firearms.   He was acquitted of possessing one firearm.   He is to be sentenced on seven counts:   Count 1 (two firearms), Count 3 (three firearms), Count 5 (one firearm), Count 7 (one firearm), Count 9 (one firearm), Count 11 (three firearms), and Count 13 (one firearm).   The jury found him guilty of possessing the two firearms in his rental car as charged in Count 17, but those are the same firearms he possessed in Counts 11 and 13.   Accordingly, his sentence in Count 17 merges into those Counts 11 and 14.

## B.   Case No. 6:13-CR-00135-AA - Assault with a Dangerous Weapon with  Intent to Commit Bodily Harm and Inmate in Possession of a Prohibited Object

On July 5, 2012, Defendant secreted two sharpened metal tubes and a metal milk dispenser handle in his prison clothing.   He walked up behind an inmate whose attention was focused on a computer screen.   Using the milk dispenser handle as a club, he bashed the victim in the head several times.   The force of the blows stunned the victim, causing him to fall to the floor.   As the severely bleeding victim scrambled away, Defendant pursued him and eventually stabbed the victim in the abdomen with one of the sharpened tubes.   After sustaining the abdomen wound, the victim eluded Defendant until prison staff could remove him.   Defendant's announced motive was to kill the inmate because he was an informant.

UNITED STATES' SENTENCING MEMORANDUM                    Page 7

In April 2014, a jury found Defendant guilty of assaulting the inmate with a dangerous weapon with intent to commit bodily harm, and being an inmate in possession of a prohibited object.   He was acquitted of assault with intent to commit murder.

**C.    Case No. 6:13-CR-00545-AA -  Assault with Intent to Commit Murder, Assault with a Dangerous Weapon with Intent to Commit Bodily Harm and Inmate in Possession of a Prohibited Object**

On August 18, 2013, Defendant had secreted a disposable razor blade in his prison clothing when he entered the exercise cage with three other inmates.   After his handcuffs were removed, Defendant punched an inmate in the face whose hands were still cuffed behind his back.   He held onto the victim as he sawed on the victim's throat with the razor blade.   The victim kicked at Defendant and unsuccessfully attempted to elude him.   When prison staff were able to remove the severely cut victim, Defendant used the razor blade to hold the two remaining inmates hostage until he negotiated his surrender and received three cigarettes.

Although he had cut open the victim's trachea, Defendant was disappointed he missed the victim's jugular vein.   Defendant wrote to a female inmate that his motive was to kill the inmate because he was an informant.

In July 2014, a jury found Defendant guilty of assault with intent to commit murder, assaulting the inmate with a dangerous weapon with intent to commit bodily harm, and being an inmate in possession of a prohibited object.

UNITED STATES' SENTENCING MEMORANDUM                    Page 8

2.    **History and Characteristics of Defendant**

A.    **Juvenile Criminal History**

While juvenile adjudications/convictions more than five years old may not be considered in calculating a defendant's criminal history category, *see* U.S.S.G. § 4A1.1(b) advisory committee's note 2; *see also id.* § 4A1.2(d)(2), this Court may consider juvenile convictions older than five years in evaluating the history and characteristics of the defendant pursuant to 18 U.S.C. § 3553(a)(1).

In *United States v. Dunn*, the district court, in rejecting the defendant's motion for a reduced sentence, considered his "extensive criminal history," including juvenile convictions.   728 F.3d 1151, 1159 (9th Cir. 2013).   The Ninth Circuit affirmed the district court's determination, noting that the district court did not err when considering the defendant's vast number of crimes, including those committed as a juvenile.   *Id.* at 1159-60.

In *United States v. Ellis*, the district court sentenced the defendant above his calculated Guidelines range, and cited "a serious juvenile conviction for armed robbery" as well as a forcible rape conviction as an adult.   641 F.3d 411, 422-23 (9th Cir. 2011).   The Ninth Circuit affirmed the sentence, but noted that the defendant's "point-by-point objections to the reasons the district court gave for 'departing' upward are beside the point."   *Id.* at 423.   The Ninth Circuit focused on "whether a moderately above-Guidelines sentence for a defendant who commits seven bank robberies, after serving prison time for rape and armed robbery [the juvenile

UNITED STATES' SENTENCING MEMORANDUM                    Page 9

conviction], is reasonable under the broad discretion afforded the district court." *Id.* The Ninth Circuit determined the district court's determination "reflected a 'rational and meaningful consideration'" of the § 3553(a) factors. *Id.* (citation omitted).[3]

Pursuant to Federal Rule of Criminal Procedure Rule 49.1, the government is also submitting information about Defendant's juvenile records under seal in a supplemental sentencing memorandum.

### B.    Adult Criminal History

In April 1984, the 19-year old defendant and an accomplice, who was acting as a lookout, broke into a car to steal its stereo.   2015 PSR ¶ 114.

In August 1984, Defendant and an armed accomplice arrived at a home in a stolen car with switched plates.   As described above, they broke into the home and when deputies arrived, the defendant fled, and the accomplice pulled a handgun and

---

[3] Other courts beyond the Ninth Circuit have similarly considered juvenile convictions pursuant to § 3553(a).   *United States v. Halliday*, 665 F.3d 1219, 1225-26 (10th Cir. 2011) (affirming sentence in which "district court expressed concern about defendant's criminal history, which included a juvenile adjudication," among other factors, pursuant to § 3553(a)(1)); *United States v. Tonks*, 574 F.3d 628, 633 (8th Cir. 2009) (district court discussed § 3553(a) factors including "unscored juvenile record," and Eighth Circuit affirmed sentence); *United States v. Torres*, 217 F. App'x 540, 543 (7th Cir. 2007) (rejecting defendant's argument that the district court could not consider his juvenile conviction in the § 3553(a) evaluation, explaining that "'the history and characteristics of the defendant are proper considerations under § 3553(a)(1), [and] this was a reasonable exercise of the district court's discretion"); *United States v. Warren*, 542 F. App'x 170, 173 (3d Cir. 2013) ("[T]he court concluded a sixty-month sentence would be inadequate considering [the defendant's] extensive criminal history as a juvenile, his prior adult conviction, the seriousness of his offense, and the need to provide adequate deterrence to criminal conduct and avoid sentencing disparities. . . . [T]he court's variance under § 3553(a) was without error.").

UNITED STATES' SENTENCING MEMORANDUM                    Page 10

was shot and killed.   2015 PSR ¶ 97.   This was Defendant's second friend who had been shot to death.

In September 1984, the defendant and an accomplice walked into a store to steal cigarettes.   1997 PSR ¶ 74.   Apprehended by a store security officer, Defendant threatened to break his neck.   2015 PSR ¶ 115.

In November 1984, Defendant punched a woman in the face for intervening while he was yelling at his girlfriend, who he had previously assaulted because she had "hurt him."   2015 PSR ¶ 116.   Defendant threatened to "blow" the woman up with his gun.   *Id.*   The girlfriend had seen Defendant, a felon, previously in possession of a gun.   *Id.*   Defendant admitted to police that he hit the woman and threatened other witnesses with a gun; however, he did not have a gun.   *Id.* Defendant assured police that his going to jail was "not going to end it."   *Id.*

In 1984, Defendant fathered a son who retained his mother's maiden last name.   2015 PSR ¶ 129.   It is unknown if Defendant has had any contact with his son, or has ever provided him any financial or emotional support.

In November 1984, Defendant and an accomplice stole a car and when stopped by police claimed to have permission.   *Id.* ¶ 98.   In the stolen car were screwdrivers and other burglar tools.   When arrested, Defendant had pending a first degree burglary charge.   *Id.* ¶ 97.

Later that month, Defendant and an accomplice stole a car from a parking structure and stole its stereo.   *Id.* ¶ 99; *see also* ¶ 114.   Although ordered to pay

$8,831 in restitution, Defendant paid nothing to the victim.   1997 PSR ¶ 59.

In December 1984, Defendant claimed to work at a tree service in Portland. 2015 PSR ¶ 138.   However, Defendant stated that during his late teenage years that he had "bought and sold gold and diamonds, including stolen items" to support himself.   *Id.*

In December 1984, Defendant stole an elderly victim's 1977 Datsun.   *Id.* ¶ 100.   He bragged to police about being a "professional car thief" who specialized in Datsun 280Zs.   *Id.*   More pertinent to this sentencing, police seized a .22 pistol from him.   It had been stolen during a burglary of a home.   Defendant claimed he had used the pistol shoot someone in a southern Oregon town.   *Id.*

This was the third time police had caught Defendant in possession of a .22 caliber pistol.   *See* 2015 PSR ¶¶ 95, 96.

In January 1984, Defendant did not appear for a court appearance on his stolen car case.   *Id.* ¶ 101.   A year later, he was arrested after he entered a sheriff's office and asked about an inmate.   *Id.*

Thirty years ago, when she was interviewed by an Oregon probation officer preparing a presentence report, Defendant's stepmother, Carol Cornelius, expressed her love and concern for him.   *Id.* ¶¶ 124, 127.   But, described him as a "sociopathic and habitual criminal who can never be expected to change."   *Id.*   She said he had a penchant for firearms and a tendency to shift responsibility for his actions to others. *Id.*

UNITED STATES' SENTENCING MEMORANDUM                    Page 12

Clinical Psychologist Robert Stuckey wrote the court in conjunction with the defendant's March 1985 presentence report, and stated that intellectually, Mr. Cornelius appears to be in the "Bright Normal range of mental abilities," "capable of manipulating and calculating his responses," and "appears to have an ability to intellectually defend himself and to rationalize away many of his problems."   Dr. Stuckey opined that "[p]sychologically, Mr. Cornelius appears to have extreme anti-social attitudes and values."

The doctor observed that Mr. Cornelius can "very easily con or manipulate others" and "certainly can present a charming and friendly façade;" however, "beneath this façade, there appears to be a remorseless, guiltless, and highly egocentric individual" who is "motivated toward satisfying his own whims and desires, without any real regard for others."

Dr. Stuckey described Mr. Cornelius' psychological profile as "an anti-social personality and a person whom one should not trust," and who "certainly appears to represent a clear danger to the community."   Because he had "little remorse for his past criminal activity," and "exhibited little empathy for others," Dr. Stuckey concluded that "Mr. Cornelius prognosis for any substantial psychological or behavioral changes is extremely poor."   2015 PSR ¶ 133; *see also* 2015 PSR Attachment.

In March and April 1985, Defendant was sentenced to concurrent five years in an Oregon prison for his burglary and failure to appear, and five-year terms of

probation for his stolen car cases.   *Id.* ¶¶ 97-101.   However, one year later, he was out of prison and on probation and driving a stolen car at speeds exceeding 100 mph on 82nd Avenue in Portland, Oregon.   *Id.* ¶ 103.

Pursued by police, Defendant lost control and crashed the car in a front yard of a Portland home.   *Id.*   He was taken to the Portland Police Precinct, issued a citation for unauthorized use of the car and released.   *Id.* ¶ 117.   Defendant refused to leave the precinct and was arrested for criminal trespass when he cursed the desk sergeant.   *Id.* ¶ 117.

The very next day, on March 4, 1986, Oregon State Police were pursuing a stolen vehicle being driven at speeds over 100 mph on Interstate 5 in Marion County, Oregon.   *Id.* ¶ 103.   The car left the freeway, went through a red light, nearly collided with several cars and hit a curb and rolled.   *Id.*   Defendant, a passenger, fled the scene but was quickly apprehended with eleven rounds of 9 mm cartridges in his pocket.   *Id.*   On the driver's side of the car, there was a loaded .22 revolver.   *Id.* Defendant was ordered to pay $6,814 in resitution to the victim.   1997 PSR ¶ 61. He reportedly paid nothing.   *Id.*

In May and July 1986, again, Defendant was sentenced to five years in an Oregon prison for unauthorized use of a motor vehicle.   2015 PSR ¶¶ 102, 103. Released from prison in October 1987, he began using a quarter to a half ounce of cocaine per day at a cost of $300 to $500.   1997 PSR ¶ 95.

UNITED STATES' SENTENCING MEMORANDUM                    Page 14

On March 4, 1988, Defendant married Richelle Barry in Portland.   2015 PSR ¶ 128.   Twenty-four days later on March 28, 1988, Defendant and an accomplice burglarized a home and were seen by the victim leaving in her car.   *Id.* ¶104.

As stated above, the manner in which this victim's home was burglarized was nearly identical to the numerous burglaries Defendant committed with his accomplices in 2010-2011.

Released from custody, from May 17 to June 7, 1988, Defendant worked at Stein Contracting Company.   1997 PSR ¶ 97.

In June 1988, while pleading guilty to burglary, the 22-year old defendant unsuccessfully attempted to escape from the courtroom.   2015 PSR ¶ 105.   While restraining the defendant, a state probation officer was injured.   *Id.*   Upon learning his victim's identity, Defendant threatened to "blow (the probation officer's) fucking head off."   *Id.*   Defendant tried to escape because he felt the court was not going to meet his sentencing expectations.   *Id.*

In August 1988, Defendant was sentenced to ten years in prison for the burglary.   *Id.* ¶ 104.   In May 1989, Richelle Barry divorced him.   *Id.* ¶ 128.

In January 1990, Defendant escaped from Oregon's correctional program in North Bend.   *Id.* ¶ 106.   A month later, he was arrested by police hiding in a bathtub behind a shower curtain in his girlfriend's Portland home.   *Id.*   In the home, officers found a semi-automatic rifle and two shotguns. *Id.*   Defendant denied

UNITED STATES' SENTENCING MEMORANDUM                    Page 15

knowing anything about the guns, but promised he would kill whoever had "snitched him off." *Id.*

In March 1990, he attempted to escape again.  *Id.* ¶ 107.  With the assistance of an accomplice, Defendant smuggled into the Coos County Jail a rope, hacksaw blade, car jack and a loaded .357 caliber revolver.  *Id.*  Defendant was apprehended by deputies while hanging onto a rope outside his jail window.  *Id.*  He had not taken the revolver with him because he did not want to get shot.  He told deputies that if given the opportunity, he would escape again.  *Id.*

In April 1990, he was sentenced to 18 months in prison for his first escape and four years in prison for his second one.  *Id.* ¶¶106, 107.  His projected release date for his two escapes in the second degree and being an inmate in possession of a firearm was April 11, 1997.  He was released from prison in January 1996 and, while in Multnomah County, began committing burglaries and thefts with accomplices.  *Id.* ¶¶ 106, 120.

Seven months after his release from prison, Defendant obtained another gun and shot a jeweler he had befriended and then robbed.  *Id.* ¶ 108.

Defendant had set up this robbery by using a ruse of friendship and a female accomplice.  He claimed to be Carl Brennan and needed an appraisal for a Rolex watch to be traded for a vehicle.  1997 PSR ¶ 12.  He told the jeweler that he had a car dealer's license and purchased cars at auction twice a week.  *Id.*

UNITED STATES' SENTENCING MEMORANDUM                    Page 16

The 31-year old Defendant introduced the jeweler to his 25-year old girlfriend. *Id.* ¶ 13.   The girlfriend referred to Defendant as "Carl" and expressed interest in buying a tennis bracelet.   *Id.*

Defendant continued meeting with the jewelry store owner until a friendship developed.   *Id.*   Defendant told the jeweler that he had been to Reno and his girlfriend had taken $13,000 cash from him but later returned it.   *Id.*

On the day of the robbery, Defendant met the jeweler during the lunch hour and accompanied him to the corner grocery store and bought sodas.   They returned to the jeweler's store and Defendant left shortly thereafter.   *Id.* ¶ 14.

Defendant returned with an envelope that he said contained $8,000 cash and asked to store it in the jeweler's safe because he didn't want to put it in a bank and have to deal with the IRS.   2015 PSR ¶ 108.   The jeweler put the envelope in his safe and spoke with the Defendant for 10 to 15 minutes.   *Id.*   Defendant asked to use the restroom, so the jeweler led him to the restroom in the back of the business, and when he turned, Defendant had a pistol in his right hand.   *Id.*

The jeweler thought it was a joke, but Defendant said, "This is no joke.   This is a robbery.   I am taking your shit."   *Id.*   When the jeweler told Defendant he might as well kill him because he was not insured, Defendant said "Get down, get your ass down or I'll shoot you."   *Id.*   The jeweler replied "then shoot me."   *Id.* Defendant gave the owner to the count of three, then shot him in the legs (the bullet went through one thigh into the other).   *Id.*   Wearing latex gloves, Defendant

handcuffed his severely wounded victim, and stated:   "Are you alright Scott?   Man, why did you make me shoot you?"   *Id.*   Defendant did take the time to wrap his victim's wounds, but instead, stole all the jewelry.   *Id.*   Defendant left his victim on the floor, bleeding handcuffed, and without hope of assistance.   *Id.*

Defendant left the jewelry store in a stolen car and drove to where the male accomplice who had supplied him with the pistol was waiting and transferred the jewelry to the accomplice's car.   1997 PSR ¶ 30.   The accomplice and defendant went to another male accomplice's home who sold some of the stolen jewelry for $40,000.   *Id.*   The $40,000 was split equally among the three men.   *Id.*   Defendant and his accomplice deceitfully withheld some of the stolen jewelry from the fence. *Id.* ¶ 31.   The accomplice gave him money for that jewelry.   *Id.*

After shooting and robbing a man he had befriended, Defendant bought himself a Harley Davidson and took it and the cash he had received and went to Reno for a good time.   *Id.*

While he was in Reno, the FBI and local police recovered three-quarters of the stolen jewelry and identified Defendant as the robber.   *Id.* ¶¶ 18, 32.   When Defendant returned to Oregon, his accomplice would not give him any money to leave town and threatened to kill him if Defendant did not kill his problems.   *Id.* ¶31.

On October 13, 1996, Defendant opted to turn himself in to police.   *Id.* ¶¶ 19, 20.   The next day, Defendant falsely told police that the woman he introduced to the

victim/jeweler had no knowledge that he intended to rob the jeweler.    1997 PSR ¶ 22.

When told by police that the jeweler remembered that the woman had addressed him with his alias as Carl, Defendant stated he would "live for the day to kill him, his wife, and his two kids and anybody else in his family that's alive" if the jeweler, the man he shot and robbed, would so testify.    *Id.*

The jeweler never gave such testimony and, on December 20, 1996, pursuant to a plea agreement, Defendant pled guilty in Washington County Circuit Court to Robbery I with a Firearm and the lesser included offense of Assault II with a Firearm.    2015 PSR ¶ 108.    The agreement called for his Oregon sentences to be served concurrent with his federal sentence.    *Id.*

On August 4, 1997, Defendant's three charges of Burglary in the Second Degree and charges of felony Theft in the First Degree and Criminal Mischief in the Second Degree in Multnomah County Circuit Court were dismissed.    *Id.* ¶120.

The Coos County Circuit Court imposed a six-month jail term because Defendant had violated the terms of post-prison supervision for his escapes in the second degree and for being an inmate in possession of a firearm.    *Id.* 106.

On February 2, 1997, pursuant to a plea agreement, Defendant pleaded guilty to being an armed career criminal before U.S. District Court Judge Malcolm Marsh.

On March 4, 1997, United States Probation Officer Parashos researched the 32-year old defendant's criminal history and found he had accumulated 28 criminal

UNITED STATES' SENTENCING MEMORANDUM                    Page 19

history points, more than twice the number he needed to be placed in the highest (most dangerous) criminal history category.   1997 PSR ¶ 70.   She determined this career criminal's sentencing guideline range to be 262 to 327 months.   1997 PSR ¶ 101.   She recommended that the defendant be imprisoned for a period of 327 months because of the violent and repetitive nature of his documented criminal history, and due to the aggravated nature of the current offense (possession of a firearm with serious injury to victim).   1997 PSR Sentencing Recommendation.   Officer Parashos also recommended Defendant pay $150,816 in restitution to his jeweler/victim which included $10,816.04 in medical costs.   *Id.*

While awaiting sentencing in March 1997, Defendant unsuccessfully attempted to escape from the Clark County Jail.

Defendant's violent criminal conduct over the seven months he had been out of an Oregon prison clearly affirmed Dr. Stuckey's 1985 opinion that he was a remorseless, guiltless, and highly egocentric, anti-social individual who was a clear danger to the community.   Nevertheless, his attorney wrote to the sentencing court that Defendant was "deeply regretful for what he did.   He befriended (the victim), the jeweler, and betrayed the friendship by committing a crime.   Even worse, when (the victim) refused to be a passive victim of the robbery, Mr. Cornelius shot him in the leg (legs) to keep him from resisting."

On April 16, 1997, U.S. District Court Judge Marsh followed the government and Defendant's sentencing recommendations and sentenced Defendant to a

UNITED STATES' SENTENCING MEMORANDUM                    Page 20

181-month term of imprisonment.   2014 PSR ¶ 109.   He was ordered to pay his

victim $150,816 in restitution at a rate of $25 per month when released from

custody.[4]

     After being at the Oklahoma Transfer Center from June 26 to July 11, 1997,

Defendant went to the penitentiary in Florence, Colorado.   On July 31, 1997, he was

sanctioned for possession of drugs.   *Id.*   In December 1997 and January 1998, he

was sanctioned for possessing a dangerous weapon.   *Id.*   In April 1998, he was

sanctioned for refusing to appear at an officer's command.   *Id.*

     In November 1998, he was transferred to the correctional institution in

Fairton, New Jersey.   While there, Defendant was investigated for planning an

escape and sanctioned for possessing an unauthorized object.   *Id.*

     In June 1999, he was transferred to the correctional institution in Sandstone,

New Mexico.   The following month, he was sanctioned for possession of an

unauthorized object.   In 2001, he was again sanctioned for possessing an

unauthorized object.

     Bernice Leeth testified before the grand jury that in 2005, that she and

Defendant's father, Thomas Cornelius, Sr., who was terminally ill with cancer,

visited the Defendant for two days.   After the visit, Defendant called his father once

or twice a week until his father passed away.

---

[4] After eighteen years, Defendant has paid his victim $1,011.86.   Because of the
accumulated interest, he still owes the betrayed friend $264,444.

Defendant asked Ms. Leeth if he had a home to come to, and Ms. Leeth said he did and could live with her as her son and help her take care of things.    She promised to sign over his father's truck to him.    Defendant promised to be "a good person" and did not want to go back to prison.

In November 2004, Defendant was transferred to the correctional institution in Phoenix, Arizona.    He requested placement in the special housing unit (SHU). In February 2007, he was sanctioned for refusing to return to the unit, and in April 2007, he was sanctioned for assaulting another inmate.    2015 PSR ¶ 109.

In August 2007, Defendant was transferred to the correctional institution in Marianna, Florida.    In 2008, he was sanctioned for smuggling contraband into the institution.    Defendant told investigators that he was a changed man due to his religious conversion in prison.

In May 2010, Defendant was transferred to the correctional institution in Estill, South Carolina.

On August 20, 2010, Defendant was released from federal prison and began his five-year term of supervised release.    He was picked up at the Portland airport by Bernice Leeth who was accompanied by her then husband, Christopher Lloyd and Christopher Myers.    He was under the supervision of former U.S. Probation Officer Scott Lewis and Oregon State Probation Officer Cheryl Nelson.

\\\

\\\

UNITED STATES' SENTENCING MEMORANDUM                    Page 22

### C.    **Family History**

Defendant declined to be interviewed by the presentence report writer.   2015 PSR ¶ 123.

He was born in North Bend, Oregon.   His mother died in a car accident when he was two years old.   *Id.* ¶ 124.   At the time of her death, she was on parole for grand larceny and forgery.   *Id.*   His father remarried a woman, Carol, who adopted him and his sister, Theresa Dailey.   He has four half-siblings and two step-siblings. *Id.*

Defendant and his sister were often runaways and involved with juvenile authorities.   *Id.* ¶ 125.   As adults, Defendant regularly communicated with his sister and professed his love for her and her family; however, Defendant consistently asked her to do things for him while rarely offering to do anything for her. Defendant offered the title to their father's pickup truck to his girlfriend, Rochelle Evans, rather than his sister and he used Sanborn's credit card or cash when paying for a meal or items for his sister and her family.

Defendant's façade as "charming," "easygoing," "soft," "gentle" and "friendly" "kindly sort of person" with the ability to "vary his approaches according to what he deems most fitting" coupled with the "enduring traits" to "behave in a nonconforming, anti-social, and anti-authority way" has enabled him to have numerous girlfriends.   *Id.*   ¶ 129; PSR Attachment, Dr. Stuckey's 1985 Psychological Evaluation.

UNITED STATES' SENTENCING MEMORANDUM                                        Page 23

In a letter he wrote on May 26, 2011, Defendant referred to Bernice Leeth as "mom."   On September 22, 2011, Ms. Leeth testified before the grand jury that she provided him with a home, a job, spending money, a vehicle, clothing, insurance and use of her pickup truck.   While he was committing armed burglaries and selling the stolen jewelry, Defendant promised her that when he returned from a trip to Hawaii with his girlfriend that he'd get a job and start paying her back.   According to Ms. Leeth, he never paid her anything.

While testifying before the grand jury, Ms. Leeth spontaneously told grand jurors:

> "I don't know if I have any input in this or not but this child (Defendant) had a chance in my home to be a good boy, to be a good man.   I was willing to take him in as a son, give him an inheritance, my home, part of it, and let him be there.   And he didn't do that.
>
> So I don't think that anybody can rehabilitate this child.   It seems like he's been in prison his whole life.   I don't know but I was told he was in and out all the time.   I didn't know the child until it was the year 2005 and I've talked to him on the phone for years. And then when he came home, that's when I got to know him.
>
> He's very likeable man.   He's got a wonderful personality and he's got a loving personality.   He always kissed me at night, good night, asked me if I needed anything and he treated me with really respect. And he didn't do anything to hurt me and didn't steal anything from me.
>
> But for what he's done to all the friends that I have and all the people that he's come in contact to, I feel like if he can do this to these people,

UNITED STATES' SENTENCING MEMORANDUM                    Page 24

he's going to do it to the next set of people too.    I just feel there's something wrong.    He's not ever going to make it on the outside world."[5]

The opinions of Carol Cornelius and Bernice Leeth affirmed Dr. Stuckey's 1985 statement that "(Defendant's) family has reported that he has betrayed them on numerous occasions, and they no longer have any trust in him."    2015 PSR Attachment.

### D.    Education/ Employment/Income

Defendant graduated from high school in 1983.    *Id.* ¶ 137.    As previously noted, intellectually he functions in the "Bright Normal" range of mental abilities.

When released from prison in 2010, according to Charlene Orchard, Defendant worked helping a disabled senior man in North Bend by staying with him while the man's wife was at work, and he also worked as a road grader.    However, today, Ms. Orchard regrets having ever met him or letting him become close to her children.

Defendant worked on Ms. Leeth's properties and did some work for senior citizens she knew.    Mr. Sanborn told investigators that Defendant also did some work for him while Defendant was living in Sanborn's home.

---

[5] After Ms. Leeth's statement, the government's attorney immediately stated: "Members of the grand jury, the witness is allowed to tell you her interests and biases in this case.    You're allowed to consider that for purposes of evaluating the credibility of her testimony, but I admonish you, you cannot take into consideration for purposes of ascertaining whether or not he (Mr. Cornelius) should be charged with these offenses her personal opinions."    Sept. 22, 2011, Grand Jury Testimony of Bernice Leeth at 30.

UNITED STATES' SENTENCING MEMORANDUM                    Page 25

### E.    Substance Abuse, Mental and Physical Health

At age 6 or 7, Defendant first used alcohol.   2015 PSR ¶ 134.   In 1997, he described himself as a "recovering alcoholic" and attributed his aggressiveness and relationship problems to his alcohol use.   1997 PSR ¶ 93.   Ms. Leeth confirmed when Defendant was drinking the "problems" began.

Although being prohibited by the conditions of his supervised release from excessive use of alcohol, Defendant regularly drank whiskey and beer with Cambalik and Sanborn, and Crown Royal whiskey with Rochelle Evans and other women.

Defendant has used marijuana, LSD, methamphetamine, cocaine and heroin; however, his illegal drug use apparently ended with his arrest in 1996.   When released in August 2010, according to friends and accomplices, Defendant only consumed alcohol and did not use drugs.   None of his accomplices told investigators that Defendant was under the influence of alcohol or drugs when they were burglarizing people's homes.

### Advisory Sentencing Guideline Range – 18 U.S.C. § 3553(4)

Defendant's total offense level is 37.   2015 PSR ¶¶ 53-91, 141.   His criminal history points have decreased to 18 because of his 1997 imprisonment.   *Id.* ¶¶ 93-112.   Nevertheless, he still places in Criminal History Category VI because he is an armed career criminal and has five criminal history points more than the minimum amount needed.   *Id.* ¶ 141.   His dismal record results in an advisory sentencing guideline range of 360 months to life imprisonment.   *Id.*

## Armed Career Criminal Act and Oregon's Burglary in the First Degree

Six of Defendant's convictions are "violent felony" offenses as defined in the Armed Career Criminal Act, twice the number needed.[6]    *See* 18 U.S.C. §§ 924(e)(1) and 924(e)(2)(B).    The penalty for each of the seven crimes for which the jury found him guilty is a fifteen-year minimum term of imprisonment and a maximum of life imprisonment without the possibility of parole.[7]    *United States v. Bland*, 961 F.2d. 123,128-29 (9th Cir. 1992); *United States v. O'Neal*, 937 F.2d 1369, 1374 n. 7 (9th Cir. 1990).

---

[6] Any contention by Defendant that his prior Oregon first degree burglary convictions do not qualify as an ACC predicate convictions was rejected by the Ninth Circuit in *United States v. Cisneros,* 763 F.3d 1236, 1241 (9th Cir. 2014)("*Mayer* therefore applies to Cisneros's first-degree burglary convictions, which means those convictions qualify as violent offenses for purposes of the ACCA."); *United States v. Mayer,* 560 F.3d 948, 962-63 (9th Cir. 2009).    In *Cisneros,* the Ninth Circuit noted that *Mayer* involved a holding that Oregon's first degree burglary statute qualified as a *categorical* crime of violence under the residual clause.    *Id.* n.3.

[7] Those convictions as set forth in the Superseding Indictment are for 1) Robbery in the First Degree, and Assault in the Second Degree, in the Circuit Court of the State of Oregon for Washington County, Case Number C962253CR, on or about May 13, 1997; 2) Escape in the Second Degree, in the Circuit Court of the State of Oregon for Coos County, Case Number 90CR0584, on or about December 23, 1991; 3) Escape in the Second Degree and Possession of a Weapon by an Inmate, in the Circuit Court of the State of Oregon for Coos County, Case Number 90CR0263, on or about December 23, 1991; 4) Escape in the Second Degree, in the Circuit Court of the State of Oregon for Multnomah County, Case Number 880633964, on or about July 27, 1988; 5) Burglary in the First Degree, in the Circuit Court of the State of Oregon for Multnomah County, Case Number 880331416, on or about June 7, 1988; and, 6) Burglary in the First Degree, in the Circuit Court of the State of Oregon for Multnomah County, Case Number 840833474, on or about February 26, 1985.

## 18 U.S.C. § 3553 (a)(2)(B) Sentence Objectives

A just punishment considers the circumstances surrounding how Defendant came into possession of the stolen firearms and his subsequent use of them along with the type and number of his prior convictions.   It fully accounts for the harm he caused to numerous victims by his conduct after being released from prison and his solicitation and use of accomplices.

It reflects the proper response to his ambushing and bashing and stabbing a fellow inmate and, a year later, striking and cutting the throat of another inmate who was handcuffed and defenseless.

Eighteen years ago, he was sentenced to 181 months in prison, 146 months less than the Probation Office thought appropriate.   The primary reason for the Court imposing such sentence was because the government and Defendant recommended it.

In April 1997, his attorney wrote to the court that Defendant felt "very guilty for the harm, both physical and psychological" he caused to the victim and family. Whatever remorse, if any, he felt for the victim he robbed and shot, and the family he threatened to kill in 1997, no longer existed.   When he was released from prison in 2010, just as in 1996, he soon resumed breaking into homes with an accomplice.

Defendant was again carrying a loaded pistol(s).   He not only stole from numerous citizens their cherished property and firearms, but also their sense of security and safety.   He again betrayed those who trusted and believed in him.

UNITED STATES' SENTENCING MEMORANDUM                    Page 28

And, as predicted by Carol Cornelius, he tried to shift his guilt to them at trial.

Only a life term of imprisonment for the seven counts of conviction by the jury for being an Armed Career Criminal, will protect the community from this defendant.   Only a life sentence without the possibility for release will ensure he will not again create more victims.[8]

In 1985, Clinical Psychologist Robert Stuckey, Oregon Parole/Probation Officer Barry Renshaw and Oregon Parole/Probation Unit Supervisor Michael best summarized the government's recommendation to this Court:

> "Before the Court for sentencing on his first known felony conviction is Thomas William Cornelius, Jr.   Mr. Cornelius has a history of repetitive criminal activity and he continues to involve himself in illegal activities, displaying no remorse or taking responsibility for his own actions.   Mr. Cornelius has violated all family and community trust, and his only support within the community at this time is gained through those with criminal orientation.   Present and past psychological evaluations indicate that Mr. Cornelius has no potential change in his behavior.   We are therefore left with no alternative but to recommend incarceration for the protection of the community."

For these very same reasons, a twenty-year sentence for cutting one inmate's throat and a ten-year sentence for bashing and stabbing another inmate, to be served concurrently with the life sentence, is not only appropriate, but will serve notice to the Bureau of Prisons to take the necessary precautions to ensure Defendant does not victimize additional inmates.   Likewise, concurrent five-year sentences for his possessing the weapons used to injure the inmates are warranted.

---

[8] Count 17 merges into Counts 11 and 13.

UNITED STATES' SENTENCING MEMORANDUM                    Page 29

The government joins with the U.S. Probation Officer's sentencing recommendation that Defendant's "total sentence" should be "life imprisonment with no term of supervised release."

Respectfully submitted this 18th day of June 2015.

BILLY J. WILLIAMS
Acting United States Attorney


*/s/ Frank R. Papagni, Jr.*
FRANK R. PAPAGNI, JR.
Assistant U.S. Attorney

UNITED STATES' SENTENCING MEMORANDUM                    Page 30